[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
"Happy families are all alike; every unhappy family is unhappy in its own way." Tolstoy — Anna Karenina. CT Page 2940
The wife, whose maiden name was Johanna C. Kuchenbecker, and the husband married at Southbury, Connecticut, on October 18, 1981. There are two children born of this marriage: Rebecca Sarah Newman born August 16, 1983; and Samuel Aaron Newman, born May 20, 1987.
The parties met in 1976 while each was married to another person. She was then nineteen (19) and he was twenty-eight (28). Both eventually obtained divorces. The wife quit working after Rebecca was born. In 1984, the parties moved to a dwelling they had purchased at 9 Lampost Drive in West Redding which has been the family residence ever since.
The wife's problems in the marriage basically began in 1987 when she realized that the Newman family was almost $250,000 in debt, counting the mortgages on the house. When the husband lost the best job he ever had on March 15, 1989, she claims that he didn't try hard enough to pursue other opportunities. She claims he was still spending money as in the past. The deteriorating financial picture put a great strain on the marriage. She harbors extreme resentment over his water skiing and other recreational activities when she feels he could have been doing more to support his family. During recent periods of erratic employment by the husband, the family lived on funds drawn from a home equity line of credit (second mortgage on residence), credit cards, and the liquidation of stocks, lands and IRA's.
The wife left the master bedroom of the house in September, 1991 and moved into another bedroom. On March 3, 1992, both parties were arrested by Redding Police after a disturbance at the house. She and the children left for the night only to discover on their return the next day that all the locks had been changed on the house. She and the children moved into a recreation room in the Kane residence. She was granted exclusive possession of the residence, but he failed to vacate and was held in contempt. She regained possession in early May, 1992.
During the wife's efforts to get back in the house, the husband cursed her, and a big "mess" followed, with the Redding Police again being called. When she finally got back in the house, it had been "trashed." While she was locked out of the house, he paid no support for her and the CT Page 2941 children. Off and on there were many weeks with no support at all. In addition, there were numerous times that the husband was violent with the wife or displayed an explosive or threatening attitude towards her.
Her life during the past four years has been an economic disaster. Bill collectors have hounded her. The electricity has been shut off. She has had problems sleeping. She saw ten years of family security go down the drain. She has done some baking and catering on the side and plans to continue this if permitted to move to North Carolina. Her affidavit of February 10, 1993 shows $50 a week from catering and $50 a week from rental of one room. She has no medical insurance for her or the children.
The husband is now forty-five (45) and in generally good health. He is a good looking man, somewhat charming and charismatic, and obviously highly intelligent. He is also almost totally lacking in any insight into himself or his motivations in dealing with his wife in this fiercely contested Family Relations custody battle. (At last report to the court, the wife had filed forty-five motions and the husband thirty.)
With able examination by all counsel and extended examination by the court, the court received a good, clear picture of what kind of a person the husband is in a play-by-play account. He graduated from the University of Connecticut in 1972. He has always since then been in the telecommunications field. A synopsis of his employment follows:
1. 1972 — a salesman with Intertel in West Haven.
2. After six months made a branch manager in Fishkill, New York, in sales, service and installation of telephone equipment.
3. 1974 — 1979 — he ran his own business, Telequip, selling telephones. His breezy and self-confident personality undoubtedly made him a great salesman. This business did well.
4. 1979 — He sold Telequip and operated as Fred Newman Associates, working as a consultant in sales matters for CT Page 2942 manufacturers and distributors.
5. 1981 — Worked full-time for Iwatsu America for a year and one-half.
6. Went with Telrad from 1983 — 1989, the time of his greatest success financially.
7. 1987 — Competition became very tough in his line of work.
8. 1989 — His job was eliminated at Telrad. The wife questions the circumstances of his departure from Telrad. She fervently beehives that he did so without adequate reason, quoting him as saying he did not want to work for a "bunch of assholes." She insists on attributing less than admirable motives to his termination of the Telrad job. The court substantially credits the husband's version. He was offered vice president of sales with a maximum pay of $80,000 and would have had to move to Long Island. He received six months severance pay beginning in March, 1989. His business prospects declined and from then on he did various consulting projects in his field through September, 1991, when the wife instituted this action. During this time, he grossed about $5,000 a month.
Starting in December, 1991, he had a consulting agreement with Digitran and, in April, 1992, he became a full-time employee at $58,000 a year. He was terminated from that job in September, 1992. He blames a lot of his business troubles on the court proceedings.
The husband claims that his wife produced most of the travail in court at a ratio of 70 percent to 30 percent. The only trouble with this claim is that he has the percentages more than reversed. Most of the court proceedings on the wife's behalf were defensive of her family and its financial survival.
The parties' joint tax returns from 1986 to 1990 show the following adjusted gross income:
1. 1986 $100,123
2. 1987 127,438 CT Page 2943
3. 1988 163,492
4. 1989 94,569
5. 1990 15,382
(Defendant's Exhibit 5)
At the time of trial, the husband's affidavit and supporting testimony showed that he has a full-time consulting position with the PCT Group in Danbury, in technical computer operations closely related to his line of work. He shows a weekly net income of $750 a week, with a net weekly wage of $487.40, but admits he has had some casual income over the recent months in an amount not ascertainable by this court. He thinks his prospects with this company are good.
The husband is now paying $200 a week child support pendente lite and $25 a week on an average of $950. He claimed at trial full custody of the children, no alimony, and child support in the $200 to $230 a week range. He said later that if he paid his $15,000 a year child support, she could make it in Connecticut.
The parties lived well during the prosperous years. They bought the Redding house for $130,000 and added about $100,000 in improvements. They bought a time share condo in Cancun, travelled extensively, and bought valuable original art. He bought a BMW. The husband claims that the breakup of the marriage was largely his wife's idea after his earning capacity dwindled. There is some merit to this claim since the wife admitted quite candidly at the trial that their great financial problems after the flush years played a "significant part" in causing the breakdown of the marriage.
No good purpose would be served by stressing the almost incredibly bitter battle between the parties. Each took part in a self-destructive orgy of litigation with almost all of it engendered by the husband's intransigence over finances and custody. The first and second mortgages on the house are now in foreclosure. Basic family living expenses were not paid. there were constant acrimonious incidents over every item of family life, including highly explosive verbal CT Page 2944 conflicts between the parties on numerous occasions when the children were exchanged.
Two incidents are cited as examples of the unrelenting psychological warfare waged by the husband against the wife. The most telling one is when he locked his wife and young children out of the family home so that they had to reside in the basement of a good samaritan for almost two months. the court largely credits her story concerning this incident. he strongly denies that any such event occurred, claiming that he changed the locks himself to protect the contents of the house from his wife. to put it mildly, his story reflects negatively on his credibility. An almost equally telling incident occurred in September, 1992 when he went to Mrs. Kane's house to pick up Sam as part of his regular visitation. The wife had taken Sam to a park across the street from the school for a photo session related to the placed where she was then working. Communications failed. The husband went into a mad rage, creating an emotional crisis for all concerned. He called the police twice. He created a scene with Mrs. Kane's housekeeper. He turned a minor glitch in custody transfer into a very disturbing incident.
This court has given much thought to the issue of fault in this case. Certainly, there is enough to go around. The husband attributes most of the fault to the wife and she claims that it was mostly his fault. The marriage has been in trouble since 1985. Both have received through the years joint and individual therapy. The husband harbors a well of bitterness against the wife, going so far as to blame her for his leaving his first wife, the mother of his first two children whom he loves very much. In the court proceedings, and earlier, the wife gave as much as she got. She is an attractive, determined and intelligent woman fighting for her children like a lioness protecting its cubs from predators. To settle the blame issue as concisely as can be done, the court finds that the blame lies 80 percent with the husband and 20 percent with the wife.
There are two overriding issues in the main case, both inextricably intertwined: (1) whether the wife should be able to move to North Carolina with the children; and (2) what financial orders should issue in view of the husband's checkered financial record. A third issue is the husband's CT Page 2945 motion for a new trial which the court will consider separately.
The court will now rule on appropriate orders in view of the criteria set forth in General Statutes, Sec. 46b-81
(assignment of property and transfer of title), Sec. 46b-82
(alimony) and 46b-84 (parents' obligation for maintenance of minor child).
The court finds that the marriage has broken down irretrievably. The marriage is dissolved on the basis of irretrievable breakdown.
CUSTODY
The wife claims that she should get sole custody of the children, subject to specific rights of visitation as set forth in the Family Relations study. The wife claims that she should be permitted to remove the children to North Carolina at the conclusion of the case. The husband argues that there should be joint custody of the children, residence with the wife, and an order that the wife shall not relocate with the children from Connecticut. He seeks visitation in accordance with the Family Relations study.
It should be noted that during the long court battle, and during the trial in this case, the husband consistently maintained a claim for custody in him. Such a stance, with no facts or legal argument behind it, suggests that this was a mere tactic in his total warfare against his wife. When asked by the court to give one good reason why he should have custody instead of his wife, who has been their primary care provider since birth, neither he nor his counsel could advance one. Counsel satisfactorily explained that she was merely advocating the view of her client.
A helpful approach to this issue will be to summarize the Family Relations study and Paul Bevins' testimony concerning it. The court will make comments where appropriate. Mr. Bevins, who has two Master in Social Work degrees, is one of the most respected Family Relations Officers in Connecticut. He and his staff spent thirty to forty hours preparing the report.
The report follows: On March 31, 1992, the court CT Page 2946 entered orders of joint custody. The children were to spend three out of four weekends with their father from Thursdays at 4:30 P.M. through Sundays at 7:00 P.M. The husband pays $100.00 per week per child under a modification order of November 16, 1992, plus $25.00 per week on a $1,250.00 arrearage. The wife's residence was observed, being a large house on a large lot adequately maintained. The husband's residence, a condo at 67 Kingswood Drive in Bethel, is moot since he plans to rent a two-bedroom condominium in Danbury. The children attend elementary school in Redding and an extended day care program. The report quotes the parties as saying that most visits have gone according to the schedule.
The wife is thirty-six (36) years old. She claims that her family has been emotionally supportive during the court battle. She is a high school graduate with some college credits. Most of her work has been as a secretary. Her most recent job, as confirmed by the testimony in court, was as a secretary for a photography company in Redding. The testimony established that she lost that job because of her reaction to the Newman wars and her frequent court appearances. The testimony also established that her earning capacity as a full-time secretary, in Connecticut is in the $20,000 range.
The wife's most recent therapist, Dr. Michael Barberie, reported that she suffered from a personality disorder "with mood and conduct disturbance." He further notes that she suffered symptoms from pre-menstrual syndrome, leading to instability of mood and inappropriate rage. The Tofranil he gave her led to "less intensive rage, irritability and mood shifts." She is currently under treatment by a social worker at the Danbury Hospital Mental Health Clinic. The wife believed she had a good relationship with her children. Several of her references, as well as several of the husband's, supported this position. The husband, both during the study and in court, also supported this claim.
The wife claimed she should be awarded custody because she always had the primary child care responsibilities. This opinion was not seriously challenged during the study. The wife claimed that her husband was purposely under-reporting income or being under-employed in order to punish her. The court will comment on this factor later in this opinion. The wife felt uncomfortable about a joint custody order, citing CT Page 2947 poor relations between her and her husband. All those interviewed were aware of these circumstances, and the husband confirmed the poor relationship between them. The court would only note that an examination of the file and testimony at the trial left no doubt of deep animosity between the parties.
The wife stated that she would like to move to North Carolina where her parents, her sister and her sister's family live. She said she would find more financial and emotional security. The court strongly agrees with this statement from overwhelming evidence in the case. She would live in her parents' home until she gets a job. Her biggest fear about remaining in Connecticut is a financial one in that the husband's payments will be inadequate and sporadic. The evidence strongly supports this claim. She agreed that she could live in Connecticut if she could earn $20,000 and receive an adequate amount in consistent child support payments. The court would note that the evidence showed an almost unbroken record of late support payments, even under the reduced support order of November, 1992. She proposed that if she were allowed to go to North Carolina, the husband be allowed to visit the children on school vacations, and that she would drive half way from the Charlotte, North Carolina, area to exchange the children, or about 350 miles. Surprisingly, in view of the great acrimony in the case, the wife said the husband could visit in North Carolina whenever he could and could stay with her parents or her sister to save money.
The husband claimed that the economy and not the divorce has caused the serious decline in his earnings. He takes medication for hypertension. Seventeen (17) year old Michelle and thirteen (13) year old Jeremy are the issue of the husband's first marriage. He has a good relationship with them. Michelle reported a close and affectionate relationship with Rebecca and Sam. The court notes that this will be restricted if the wife and children move to North Carolina, but the court must also note that Michelle will be going to college next year which could have the same effect.
The husband also suffers from depression. In addition to earlier therapy, he was treated by Dr. Michael Barbarie from October, 1987 through late 1991. Dr. Barbarie said the husband has a personality disorder "with moral and conduct CT Page 2948 disturbance." His "personality profile reflects a fluctuating sense of self-worth with sensitivity to criticism resulting in grandiose defiance." He has been on Prozac since July 1990 and has felt "in better control and better spirits." He has been under treatment at Danbury Hospital Mental Health Clinic since June 5, 1992.
The husband claimed that he enjoyed a good relationship with Rebecca and Sam. The court would note that he is a good loving father to the two children and that they love him. The court would also note that the children, insofar as it is reasonably possible, under all of the circumstances of this case, need and deserve close connections with their father. The wife confirmed this during the trial with minor reservations. Rebecca is in fourth grade but is not doing as well as she should according to convincing testimony from her teacher, Mrs. Honey. She would not like to move away from her friends. Sam, at five, does not participate in any outside social activities but he is doing well in kindergarten. Mary Joe Dirks, director of the extended day care program which both children attend after school, described both children as basically well-adjusted and well-behaved.
Mr. Bevins' testimony tracked the Family Relations report faithfully. Mr. Bevins states that the investment of money, time and emotions appears to have had a detrimental effect on the parents and the children. The wife is capable of continuing to meet the children's basic needs. She appears to enjoy better physical and emotional health than the husband. The husband appears to be genuinely motivated to remain involved in the parenting of his children. His desires in this regard are not realistic. When the report was completed (January 29, 1993), his reported earnings are hardly enough to provide for his own basic health needs let alone pay for his rather expensive rent.
The wife's desire to relocate is appropriate. The best time would be at the end of the school year. The wife should be required to live in Connecticut with the children if the husband would make the support payments requested by her and pay them regularly. The court, generally, thoroughly agrees with Mr. Bevins' written and oral testimony except as to his recommendation number two. His recommendations are: CT Page 2949
1. Custody to the plaintiff, but no move out of state at least until the end of the present school year.
2. Review by the court of the defendant's business and support payment pattern in the spring of 1993. If he is able to pay $400 per week and has been paying the existing order regularly, and if has secured a salaried job at which his pay can be garnished, then the plaintiff should be required to continue living in the Redding/Danbury area.
 "The guiding principle applicable to determining the custody of children in a dissolution proceeding is the best interest of the child. General Statutes, Sec. 46b-56(b), Spicer v. Spicer, 173 Conn. 161, 162, 377 A.2d 259 (1977); Simons v. Simons, 172 Conn. 341, 347, 374 A.2d 1040
(1977). Our Supreme Court has stated that `[i]n the search for an appropriate custodial placement, the primary focus of the court is the best interests of the child, the child's interest in sustained growth, development, well-being, and in the continuity and stability of its environment.' Cappetta v. Cappetta, 196 Conn. 10, 16, 490 A.2d 996 (1985). This standard articulates the right of children in custody cases to be placed in an environment where they are not abused and neglected but rather where they are loved and nurtured."
G. S. v. T. S., 23 Conn. App. 509, 582 A.2d 467 (1990).
The court acts pursuant to General Statutes, Sec. 46b-56(b) which provides:
 "In making or modifying any order with respect to custody or visitation, the court shall be guided by the best interests of the child, giving consideration to the wishes of the child if he is of sufficient age and capable of forming an intelligent preference, provided in making the initial order the court may take into consideration the causes for dissolution of the marriage or legal separation if such causes are relevant in a determination of the best interests of the child."
The court could simply state that it agrees with the CT Page 2950 Family Relations report and order the move to North Carolina because he has not offered to pay $400 a week support and the court cannot, on the evidence in this case, justify such an order. The parties, however, are entitled to a further explication of the court's reasoning on this matter.
The court will credit the husband's written proposal that he pay $300.00 a week support. A little background from the trial is in order. The court considers this proposal to be the husband's response to a colloquy with the court wherein the court suggested to him that with the $200 a week figure he secured on his motion to modify support, his wife and children couldn't possibly survive in the Danbury area. She is in severe economic distress with two mortgages under foreclosure, a very limited income and even the utilities scheduled to be shut off when the laws allow this on April 15. To draw him out and reveal the unrealistic nature of his relentless opposition to the move to North Carolina, the court suggested that the bare minimum she would need from him when she began paying Danbury area rental figures would he $300 a week support. This assumed that she regained a job at about $20,000 a year and was able to get reasonable day care for the children. The court in no way stated that such a figure would he adequate. No meticulous analysis of her financial needs is necessary at this point. In this high rent district, even $400 a week would be a close call.
His agreeing in court and in his brief to such a figure does not in any way remove the urgent financial urgency of the move to North Carolina. Giving him reasonable credit for such a proposal, a leopard doesn't change his spots. He has an almost unbroken record of late support payments. Only last November, he moved to modify support and got a reduction to $200 a week from $450 a week earlier order made up of $200 support and $250 alimony per week. In response to his claim that $300 a week support should be enough to require the wife to remain in Connecticut, the court must ask why he didn't offer to pay that amount when he got the reduction? Further, does he not impugn his affidavit and testimony regarding his income by making such a proposal? He pays $125 per week for Michelle and Jeremy and he is about to rent a condo for $750 a month or $180 a week. These two items plus the $300 a week support he proposes equal $605 per week leaving him, according to his most recent affidavit and testimony showing a net weekly income of $487.90, a net weekly deficit of CT Page 2951 $117.60 per week. The court will accept his statement that he should pay $300 a week support, and the inevitable implication that he can afford to pay this amount, for the true state of his finances is best known to him alone. The court has already stated that this is not enough to maintain her and the children in Connecticut. Most importantly, the entire record of this case fails completely to convince the court that his post-judgment support would be any more certain, regular and stable than it has been in the past.
The court concludes that it is in the best interests of the children that the plaintiff be allowed to move to North Carolina and establish residence with them there.
The following credible claims of the wife support the court's decision on the move to North Carolina. She has no family in Connecticut. the primary reason for moving to North Carolina is for the financial and emotional support she and her children would receive from family members in North Carolina. She plans to move to the town where her parents, aunts and two sisters and their families live. she and the children can live in her parents' home. With foreclosure pending on two mortgages on the family home at 9 Lampost Drive, she has no money for the payment of rent or a security deposit when the family is evicted from the property.
Her sisters will assist with day care and baby sitting needs so that she can seek employment on a full-time basis. This flexibility will enable the wife to run a part-time catering business as well to earn additional money. On her trip to North Carolina last December, she saw a three bedroom house advertised for under $60,000. The lower cost of living in North Carolina plus the emotional, financial and moral support she can expect to receive from her family light the way to a secure, stable environment which she and the children so urgently need. The court's conclusion permitting the move to North Carolina is strongly supported by Attorney Dornfeld, attorney for the children, who in the diligent discharge of her duties became so intimately familiar with the circumstances of the Newman family.
The wife swore twice, under questioning from the court, that she would continue to raise the children in the Jewish faith. She finished simply by saying, "They're Jews." The court accepts this commitment. CT Page 2952
The plaintiff is granted sole custody of the two minor children. The plaintiff is granted the right to move to North Carolina with the children at the end of the school year or when she is forced to leave the house under the pending foreclosure actions, whichever first occurs. Visitation is ordered, pursuant to the Family Relations report, as follows:
3) For however long the plaintiff lives in this area visitation is ordered according to the following schedule:
 A) Alternate weekends from after school on Friday through 7:00 p.m. on Sunday (7:00 p.m. on Monday on holiday weekends).
 B) Wednesdays from after school until 7:00 p.m.
 C. Alternate Christmas, winter and spring vacations from the day after school ends until two days before school resumes. These visits should also end at 7:00 p.m.
 D) Father's Day with the defendant and Mother's Day with the plaintiff.
 E) Alternate Thanksgivings with the defendant beginning in 1994.
 F) Summer vacations with the defendant from July 1st through July 31st each year, and the plaintiff telephones the children each Sunday and Wednesday of the month at 7:00 p.m. The plaintiff has two uninterrupted weeks of her choosing each August for vacation time with the children.
G) Alternate Jewish holidays until 7:00 p.m.
 H) All holidays and vacations take precedence over regularly scheduled visits.
4) If the plaintiff moves to North Carolina, visitation is ordered as follows pursuant to Family Relations recommendations: CT Page 2953
 A) July 1st through July 31st each year (except 1993).
 B) Christmas, winter and spring vacations each year from the day after school ends until December 30th at Christmas and until two days before school resumes in the winter and spring.
 C) The plaintiff drives half way to Connecticut to pick up and drop off the children.
 D) Any other reasonable requests by the defendant when he is able to travel to the area in which the children live subject to a seven day written notice.
 E) Written weekly reports mailed by the plaintiff to the defendant summarizing on at least one single-spaced page the highlights of the children's week. These summaries should address the children's accomplishments as well as their problems.
 F) Phone calls by the defendant to the children should occur on Sunday and Wednesday at 7:00 p.m. The plaintiff should also enjoy similar phone contact bring the children's month long visits with their father in July.
SUPPORT AND MEDICAL COVERAGE
The defendant is ordered to pay the plaintiff $300 per week support plus $25 a week on the current arrearage. Providing the defendant is current with his child support payments, he is allowed to claim the children as dependents on income tax returns.
MEDICAL COVERAGE
The defendant is ordered to obtain at least the equivalent of Blue Cross/Blue Shield for the children immediately. All unreimbursed medical or dental expenses incurred on behalf of the children shall be shared by the parties with the defendant paying two-thirds and the plaintiff one-third. CT Page 2954
ALIMONY
The plaintiff seeks $250 a week alimony. The defendant urges no alimony to either party. None is awarded to the defendant. Concerning an award of alimony to the plaintiff, the court does not agree with the plaintiff's claim that she prove that the defendant is currently able to pay a viable alimony award. It is found that he marginally had certain non-recurring extra income during the litigation stage that he did not put in the parties' joint bank account pursuant to this court's orders. He received a $8,000 relocation expense in April, 1992 and $750 per month commuting expenses while he was providing consulting services to Digitran. He says he spent this amount paying bills. The court largely accepts this explanation.
Such conduct falls far short of the malevolent scenario painted by the plaintiff. They claim "Mr. Newman quit this job (when he had made $163,497 at Digitran) and spent the next two summers water skiing." The court does not conclude that the husband "intentionally and substantially reduced his income so as to minimize the amounts that can be ordered for child support and alimony."
He lost his Digitran job because he would not move to New Jersey and accept an income limit of $80,000. There was some hubris on his part. He underestimated the effects of the recession and overestimated what he could produce on his own. The court's conclusion is buttressed by the role that financial success and the appearance of prosperity play in his estimation of self-worth. He rashly bought a $30,000 plus BMW out of the Home Equity second mortgage on his house. It is not likely that just to spite his wife and children he would incur a $1,100 a month rental arrearage on his condo which he has provided for payment out of his share of the house proceeds by a mortgage on Lampost Drive in the amount of $12,000 to his friend James Dougherty. Although he has under-reported his income in certain ways, he can't now afford substantial alimony. He does have a vastly greater earning capacity than his wife. His talents and experience in telecommunications would indicate that his income should substantially improve as the economy recovers. The defendant is ordered to pay to the plaintiff the sum of $1 per year alimony until: CT Page 2955
(1) ten years from the date of this judgment;
(2) the death of either party;
 (3) the plaintiff's remarriage or the plaintiff's regular cohabitation with an unrelated male.
FAMILY RESIDENCE
The wife seeks an order transferring the entire interest in the residence at 9 Lampost Drive, Redding, Connecticut, to her. There is no fire or liability insurance on the house. The husband proposes that the property be sold and after payment of the two mortgages, commissions and usual closing costs the parties pay the joint debts to IBM Credit Union, Bank of New York, the IRS on the 1990 return, and Helen Newman. The Bank of New York debt is $3,427; IBM Credit Union $7,865; IRS $1,386 for a total of $12,678.00. All of those involved recognize the very difficult real estate market in this area at this time. The wife values the property at $299,000 which the court will round out to $300,000, the figure used by the husband. She shows a first mortgage at $125,000 and second at $80,000 for a total of $205,000 in mortgages. He shows a $210,000 in mortgages. By the time one or both foreclosures go to judgment, additional interest will have accrued, including legal fees and costs which can he very substantial if there is a foreclosure sale, so that the total obligation for the two mortgages could easily be in the range of $225,000. The husband has already tried to take the most he could expect from his equity by placing on his half interest a $10,000 mortgage to his mother, Helen Newman, a $12,000 mortgage to James Dougherty, and a $5,643 mortgage to his former attorney.
The record does not contain any evidence as to whether or not a lis pendens was filed against the defendant's interest in the property when the dissolution action was started. If so and if the effect of this may result in the plaintiff receiving a greater return from the sale of the property, the court would reach the same conclusion. It can readily be seen that it is highly uncertain whether there will be any equity in the property at all. Whatever there is should belong to the plaintiff to help her secure a residence in North Carolina for her and the children. Pursuant to CT Page 2956 General Statutes, Sec. 46b-81(a), there is transferred from the defendant to the plaintiff all of the defendant's right, title, and interest in and to 9 Lampost Drive, Redding Connecticut.
JOINT DEBTS
All of the joint debts of the parties shall be paid by the defendant since the plaintiff will have a tight squeeze financially at best and the defendant has a very high earning capacity. Each party shall pay any other debt shown on the affidavits.
ART
The parties' art collection is shown at insurance valuation on Plaintiff's Exhibit C. The plaintiff's share will not be reduced by $2,600, the amount she received for Hawaiian Sailing, since she needed this money for urgent family expenses. It is not proper or necessary to strip the defendant of all assets. The art remaining shall be shared as nearly equally between the parties at the stated value as possible. Such division may be supervised by the Chief Family Relations Officer. If the parties are unable to agree, the matter may be referred to the Superior Court for final distribution. Each party shall deliver to the other any certificates of authenticity available to that party and related to art allocated to the other arty. Any dispute may be referred to the court for further necessary orders concerning the allocation process.
MISCELLANEOUS ORDERS
1) The BMW is awarded to the defendant and the Plymouth Voyager is awarded to the plaintiff.
2) Personal Property.
The defendant is awarded the cherry chess set, the crystal collection, the Toby Jug collection and the glass ship bottle. The plaintiff is awarded the Japanese Damazene screen and the Aztec wooden calendar together with all remaining personal property in the family residence.
3) The defendant is awarded the power boat which the CT Page 2957 parties own.
4) Condos in Cancun. The condos are split between the parties with the plaintiff awarded the use of the unit on which she made the maintenance fee payment for 1991, and the defendant awarded the use of the unit on which maintenance fees are owed for the year 1991.
5) The plaintiff shall be allowed to copy each of the software disks the parties own.
6) The defendant is ordered to maintain life insurance on his life in the amount of $100,000, naming the children the irrevocable beneficiaries, until Samuel shall become eighteen (18).
7) Each party shall pay his or her own counsel fees.
T. Clark Hull State Trial Referee
CT Page 2957